IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, NORTHERN DIVISION

| | | |
|---|---|---|
| KENNETH THOMAS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. WDQ-08-0833 |
| J. MICHAEL STOUFFER, et al., | * | |
| Defendants. | * | |

\*\*\*

MEMORANDUM OPINION

Kenneth Thomas sued J. Michael Stouffer, Maryland Commissioner of Correction, and others ("the Defendants") for violating his Fourteenth Amendment rights. Pending is the Defendants' motion to dismiss or for summary judgment. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the following reasons, the Defendants' motion will be granted.

I. Background[1]

Thomas is an inmate at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. ECF No. 1. On July 14, 2007, while an inmate at Western Correctional Institution ("WCI"), Thomas participated in a planned, widespread assault between members of his gang (the L Gang Blood) and the Dead Men Incorporated. ECF No. 34, Ex. 1 at 2. During the attack, multiple assaults occurred on several of WIC's courtyards. *Id.* Prison staff observed Thomas repeatedly stab another inmate and flee to the basketball courts where a homemade weapon was later found. *Id.* Thomas pled guilty to assault and received 150 days segregation and 365 days

---

[1] In reviewing the Defendants' motion, Thomas's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

without visitation. *Id.*[2]   On July 17, 2007, Thomas, and several other prisoners, were transferred to NBCI because of the assaults. *Id.*

Upon arrival at NBCI, Thomas was assigned to administrative segregation and placed in the special management unit ("SMU").[3]  ECF No. 1 at 5.  He was provided with a notice of assignment which stated "reasons exist to believe [you are] dangerous to the security of the institution and/or staff and/or inmates." *Id.;* ECF No. 34 at 5.

On July 19, 2007, Thomas's administrative segregation status was reviewed at a hearing he attended.  ECF No. 1 at 5.  On August 7, 2007, another review was held.[4]  At the hearing, Thomas was placed in NCBI's Quality of Life ("QOL") program, and assigned to its intake level because of his assault at WCI.[5]  ECF No. 14, Ex. 1 at 41-42.  Thomas was asked to sign a paper. ECF No. 1 at 5.  He refused to sign, and was informed he would remain on the intake level until he did.  ECF No. 1 at 5-6.[6]

While on the SMU, Thomas's status was reviewed monthly.  ECF No. 14, 5-43.  On December 10, 2007, Thomas pled guilty to assaulting an NCBI staff member during a cell

---

[2]  Thomas was charged with second degree assault, for which he received an additional four-year sentence. *Maryland v. Thomas,* Case No. 01408012375, Cir. Ct. for Allegany Co. Md. (2009).

[3]  The SMU houses inmates "deemed a significant security threat by a history of violent behavior that includes, but is not limited to, violence towards staff members or other inmates."  ECF No. 14, Ex. 3 at 6.

[4]  Thomas, his case manager, a prison psychologist, an intelligence officer and several other NBCI staff attended the August 7, 2007 hearing.  ECF No. 1.

[5]  The QOL program is a behavioral management program for inmates who exhibit or influence other inmates to engage in threatening behavior.  ECF No. 14, Ex. 3 at 6.  Thomas was identified as an influential gang member who engaged in threatening behavior.  ECF No. 14, Ex. 1 at 41-42.

[6] Intake level inmates were allowed: (1) to possess "program allowable" property, (2) two showers per week, (3) one day of recreation per week in a three-piece restraint, and (4) no visitors except legal and clergy.  ECF No. 14, Ex. 3 at 8.

extraction. ECF No. 26, Ex. 1 at 14. Again, he received 150 days segregation. *Id.* Because of his assault on the staff member and his refusal to participate in the QOL program, Thomas remained on the intake level until February 19, 2008, when he was elevated to level 1. ECF No. 14, at 8.[7] Thomas remained on level 1 until April 29, 2008 when he opted out of the program and was placed on administrative segregation. ECF No. 14, Ex. 1 at 5.[8]

On April 13, 2009, Thomas was returned to NBCI's general population, because he had completed the "Taking a Chance on Change" course and been infraction-free, with no new evidence of gang involvement, for over a year. ECF No. 34. Ex. 5 at 9.

Thomas asserts that the SMU and QOL program exposed him to "atypical and significant conditions" including: (1) solitary confinement, (2) no visits, (3) an indefinite stay, (4) only one hour of recreation a week, which was allowed while he wore a three-piece restraint, (5) forced participation in the QOL program, (6) no access to self help groups, (7) inability to work and earn good time credits, and (8) no human contact. ECF No. 1 at 7.[9]

Thomas also asserts that on August 21, 2007, Officer Neco "took [him] to get [his] property . . . labeled it contraband . . . and forced [Thomas] to send [his] property out." ECF No. 1 at 6. Another inmate filed a grievance with the Department of Public Safety and Correctional Services on Thomas's behalf, which was dismissed because he had not exhausted his administrative remedies. *Id.* at 6-7; ECF No. 14, Ex. 1 at 92.

---

[7] Level 1 inmates had the same restrictions as intake level inmates, but did not wear a three-piece restraint during recreation. ECF No. 14, Ex. 3 at 9.

[8] In April 2008, the QOL program became voluntary. Inmates opting out of the program were placed on administrative segregation. ECF No. 14, Ex. 1 at 5. Thomas signed an informed consent form opt-outing of the program, and was reassigned. *Id.*

[9] At WCI, Thomas asserts he worked a sanitation job, earned five good conduct credits a month and 90 cents a day, had six hours of recreation a week, shared his cell, attended religious services, and was allowed to possess a television, radio, and fan. ECF No. 1 at 7.

3

Thomas asserts that his Fourteenth Amendment due process rights were violated because: (1) he did not receive adequate hearings before or after his transfer to NCIB's SMU, where he was forced to participate in the QOL program, and (2) he was improperly deprived of his property. ECF No. 1 at 7-9. He also claims that the Division of Corrections' rules for the QOL program violate Maryland's Administrative Procedure Act ("APA"). *Id.* at 8-9.

II. Analysis

A. Standard of Review

Under Fed. R. of Civ. P. 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48 (emphasis in original).

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002), but the Court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003)(quoting *Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993)).

B. Pre and Post-Transfer Hearings

The Fourteenth Amendment's Due Process Clause protects against deprivations of "life, liberty, or property." U.S. Const. amend. XIV. To determine whether a plaintiff has been deprived of due process, courts ask two questions: (1) whether the state has interfered with a protected interest? and (2) whether sufficient process accompanied that interference? *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005).

Mere transfer from one prison to another does not implicate a liberty interest. *Id.* ("[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."). Thomas was not entitled to any process simply because he was transferred to NBCI. *Id.*

However, "States may under certain circumstances create liberty interests which are protected by the Due Process Clause" including an interest in "freedom from restraint [which] . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). Thus, if Thomas's assignment to NBCI's SMU and QOL program was an "atypical and significant hardship" compared to "ordinary prison life," he had a protected liberty interest in avoiding that confinement. *See Beverati v. Smith,* 120 F.3d 500, 502-03 (4th Cir. 1997).

Thomas argues that conditions on the SMU and the QOL program restrictions varied significantly from conditions normally imposed on administrative segregation prisoners. ECF No. 18 at 4. He argues that other administrative segregation programs allow inmates: (1) one hour of out of cell activity a day, (2) to acquire property, (3) and to have visitors. *Id.* 4-7. He argues that his placement in the SMU and on the QOL intake level was potentially indefinite.

ECF No. 1 at 5-6. Assuming this shows a protected liberty interest,[10] the second consideration is whether sufficient process accompanied Thomas's placement.

Three factors are considered in deciding whether the procedures used were sufficient: (1) the nature of the private interest affected, (2) the risk of erroneous deprivation through the procedures used, and the probable value, if any, of additional procedural safeguards, and (3) the Government's interest, including the function involved and the fiscal and administrative burdens of additional or substitute procedural requirements. *Wilkinson,* 545 U.S. at 224-25 (*citing Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)).

As to the first factor, Thomas's "private interest . . . must be evaluated . . . within the context of the prison system and its attendant curtailment of liberties." *Id.* at 225. As a prisoner, Thomas was not entitled to the process due to persons at liberty prior his assignment to the SMU. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Id.* (*citing Gerstein v. Pugh,* 420 U.S. 103 (1975)). In short, Thomas was not entitled to an adversarial hearing, witnesses, evidence introduction, or other features of a full trial.

The second factor addresses the risk that Thomas was erroneously placed in the SMU and QOL program under the procedures used, and the probable value of any additional procedures. Notice and a fair opportunity to rebut the factual basis for his placement are "the most important procedural mechanisms for purposes of avoiding [an] erroneous deprivation[]." *Id.* at 225-26. Thomas argues that he did not receive notice of the factual basis for his transfer to NBCI or

---

[10] *See Wilkinson,* 545 U.S. at 224 (conditions in maximum security prison were atypical and significant when: (1) inmates lived in solitary confinement, (2) were exposed to light 24 hours a day, (3) were limited to one hour of daily indoor exercise, (4) the potential duration of placement was indefinite, and (5) placement disqualified inmates for parole consideration).

placement on the SMU. ECF No. 18 at 10, 12-13. He argues that there was no proof he was involved in gang activity and that he was not provided an adequate opportunity to rebut that allegation. *Id.* He argues the review process was inadequate because the QOL regulations did not provide an appeal procedure. *Id.* The Defendants argue that his placement was made "only after it was determined that he had engaged in conduct that posed a threat to security" and an investigation shown that Thomas was a gang member. ECF No. 14 at 18.

The undisputed evidence is that Thomas possessed a weapon, which he used to stab another inmate during a mass disturbance. ECF No. 14, Ex. 1 at 4. He was told why he was assigned to the SMU and the QOL program; he was believed to be dangerous to NCBI and its general population. *Id.* at 6. This belief was based on his gang affiliation and participation in the mass assault at WCI. *Id.* at 7. Thomas was also informed why he remained on the SMU and at the QOL program's intake level; he was viewed as a continuing danger to NCBI because he had assaulted a staff member, and he refused to participate in the QOL program. *Id.* at 8-9. Thomas had an opportunity to be heard at the status hearing he received upon transfer to NBIC and at his monthly status reviews. *Id.* at 11-44. He also had an opportunity to be heard when he pled guilty to the two assault charges. *Id.* These procedures were sufficient to prevent an erroneous deprivation of Thomas's interests. *See Wilkinson*, 545 U.S. at 225-26 (providing inmates brief factual basis for placement, opportunity to be heard at placement hearing and annual placement reviews, and avenue to appeal decision was sufficient process).

The record does not show that Thomas was presented with the intelligence prison officials relied on to determine his gang affiliation.[11] However, under the third factor, the Government's interest in withholding this information outweighs any additional value its

---

[11] The Defendants have submitted this evidence under seal. ECF No. 34. It reveals the sources of information the Defendants used to determine Thomas's gang membership. It is not a basis for this decision.

disclosure may have had in safeguarding Thomas's interests. "The State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves," *id.* at 227, and deference should be given to the expertise of prison officials in matters of security, *see Sandin,* 515 U.S at 482-83.

There is no genuine dispute whether Thomas was afforded adequate process for his placement on the SMU and in the QOL program. The Defendants' motion for summary judgment will be granted on this claim.

   C.  Property Claim

Thomas claims that Officer Neco improperly deprived him of his property without due process. Access to an adequate post-deprivation remedy is sufficient due process for a prisoner improperly deprived of property. *See Parratt v. Taylor,* 451 U.S. 527, 542-44 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327 (1986). The right to seek damages and injunctive relief under Maryland law is an adequate remedy. *See Morton v. Hopkins*, 819 F.2d 1138, 1138 (4th Cir. 1987) ("Maryland tort remedies provide an adequate avenue for relief" to a prisoner alleging he was deprived of personal property without due process). Summary judgment is also appropriate on Thomas's deprivation of property claim. The Defendants' motion will be granted on this claim.

   D.  Maryland APA Claim

Thomas claims that the Division of Corrections failed to comply with Maryland's APA in implementing rules governing assignment to the QOL program. Having determining that summary judgment is appropriate on Thomas's federal claims, this Court declines to exercise its supplemental jurisdiction over his state law claim. *See* 28 U.S.C. § 1367 (c) (3); *Shanaghan v. Cahill,* 58 F.3d 106, 110 (4th Cir. 1995). That claim will be dismissed without prejudice.

III. Conclusion

For the reasons stated above, the Defendants' motion for summary judgment will be granted as to Thomas's due process claims.

December 7, 2010                                                              /s/
Date                                                                        William D. Quarles, Jr.
                                                                             United States District Judge